IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA
*ex rel.* Patricia Hopson,

    Plaintiff,                                              Case No. 6:13-cv-775-Orl-37GJK

v.

AIR IDEAL, INC. and
KIM AMKRAUT,

    Defendants.
_____/

## **UNITED STATES' COMPLAINT**

The United States of America, on behalf of its agencies, the Army, U.S. Army Corps of Engineers (USACE), Coast Guard, Department of Interior, and the Small Business Administration (SBA), states as follows:

### **Introduction**

1.    The United States alleges that Air Ideal, Inc. and its owner and chief financial officer, Kim Amkraut, falsely claimed and received over $5 million from the United States. This money was paid to Air Ideal under several contracts which government agencies had set aside to award to a company that qualified for the Historically Underutilized Business Zone (HUBZone) program. Air Ideal and Amkraut knowingly misrepresented Air Ideal's eligibility for the program and submitted forged documents to the SBA to obtain certification as a HUBZone business, to fraudulently obtain the contracts, and to fraudulently claim money under those contracts.

2. As a result of the defendants' misconduct, the defendants undercut one of the central purposes of the contracts and of the HUBZone program, which is to support small businesses that locate in geographic areas that have historically been unable to attract businesses and jobs. Accordingly, the United States did not receive the intended benefits of a qualified HUBZone company receiving and performing federal contracts.

3. In Air Ideal's submission of its HUBZone application, its bid for the government contracts, and its claims for payment under those contracts, the defendants submitted and/or caused to be submitted to the United States false and/or fraudulent claims and false statements regarding its HUBZone eligibility. These claims and statements falsely and/or fraudulently implied and/or expressly represented that Air Ideal's principal office was located in a designated HUBZone, that Air Ideal was qualified for and remained qualified for the HUBZone program, and that Air Ideal was eligible for the government contracts.

4. The United States paid over $5 million to Air Ideal because of the defendants' false and/or fraudulent representations in connection with its HUBZone application and its bid on, and receipt of, the government contracts.

## The Law

### A. False Claims Act

5. The False Claims Act (FCA), at 31 U.S.C. § 3729(a)(1)(A) (2010), provides that a person is liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

6. The FCA, at 31 U.S.C. § 3729(a)(1)(B), also provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

7. At 31 U.S.C. § 3729(b), the FCA defines the term "knowingly," as applicable in the above provisions, to mean that a person, with respect to information,
"(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information"; and further provides that no proof of specific intent to defraud is required.

**B.    The Financial Institutions Reform, Recovery, and Enforcement Act of 1989**

8. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), at 12 U.S.C. § 1833a, provides that any person who violates, or who conspires to violate, any one of certain listed provisions of the law is liable for a civil penalty of up to $1.1 million (as adjusted by 28 C.F.R. § 85.3(a)(6)). § 1833a(b)(1). However, in the case of a continuing violation, the court may impose a penalty of up to $5.5 million (as adjusted by 28 C.F.R. § 85.3(a)(7)). § 1833a(b)(2). In the case where a violation results in pecuniary gain or loss, the amount of the penalty may exceed the above-listed maximums, so long as the penalty does not exceed the gain or loss. § 1833a(b)(3)(A).

9. One of the provisions to which FIRREA applies is section 16(a) of the Small Business Act (15 U.S.C. § 645(a)). 12 U.S.C. § 1833a(c)(3). Section 16(a) imposes liability on anyone who "makes any statement knowing it to be false . . . for the purpose of influencing in

any way the action of the [Small Business] Administration, or for the purpose of obtaining money, property, or anything of value . . . under this chapter . . . ." 15 U.S.C. § 645(a).

## Jurisdiction and Venue

10. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a). The Court may exercise personal jurisdiction over the defendants under 31 U.S.C. § 3732(a) because the defendants reside or transact business in this District, or committed proscribed acts in this District.

11. Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and (c), as defendants Air Ideal and Amkraut reside in this District and committed proscribed acts in this District.

## The Parties

12. The plaintiff is the United States of America, acting on behalf of the Army, USACE, Coast Guard, Department of Interior, and SBA. The SBA, among other activities, oversees the HUBZone program.

13. Defendant Air Ideal is a general construction and HVAC (heating, ventilating, and air conditioning) contractor. Air Ideal identifies its main office as presently located at 7033 Stapoint Court, Suite A-1, Winter Park, Florida 32792.

14. Defendant Kim Amkraut is the owner and chief financial officer of Air Ideal. She lives in Winter Springs, Florida.

**Factual Allegations**

    A.    **The HUBZone Program**

    15.    Congress enacted the HUBZone program in 1997 to encourage small businesses to locate in areas of the country that traditionally experienced difficulty in attracting business. The goal of the program is to spur investment and job growth in areas where both were lacking. As Congress explained, the HUBZone program "targets special Federal government help to inner cities and rural counties that have low household incomes, high unemployment, and whose communities have suffered from a lack of investment." S. REP. NO. 105-62, at 25 (1997), 1997 U.S.C.C.A.N. 3076, 3098. Creating incentives for small businesses to locate in targeted communities is the fundamental goal of the HUBZone program. "[W]ithout businesses in these communities, we don't create jobs, and without sources of new jobs, we are unlikely to have a successful revitalization effort." *Id.* at 3099.

    16.    Towards that end, the HUBZone program gives preferences in government contracting to businesses that qualify as a HUBZone small business concern. 15 U.S.C. § 657a. Among other options, agencies can designate a contract as a HUBZone set-aside, which restricts competition for the contract to only those companies that are HUBZone certified. 15 U.S.C. § 657a(b)(2)(B).

    17.    The SBA has the authority to certify a company as a qualified HUBZone firm. 13 C.F.R. § 126.300. To qualify as a HUBZone small business concern, the applicant must meet four basic eligibility requirements. First, as applicable to Air Ideal, the business must be owned

and controlled by a U.S. citizen. 13 C.F.R. § 126.200(b)(1)(i).[1] Second, it must qualify as a small business. 13 C.F.R. § 126.200(b)(2). Third, the business's principal office must be located in a HUBZone designated as such by regulation. 13 C.F.R. § 126.200(b)(3). Finally, at least 35 percent of the business's employees must reside in a HUBZone. 13 C.F.R. § 126.200(b)(4).

18.     The SBA defines "principal office" as the "location where the greatest number of the concern's employees at any one location perform their work." 13 C.F.R. § 126.103. In making this determination, a business whose primary industry is service or construction can exclude those employees who "perform the majority of their work at job-site locations to fulfill specific contract obligations." *Id.*

19.     An SBA "Frequently Asked Questions" webpage explained that companies that designated all of their employees as job-site employees, and where no one actually performed work in the office located in a designated HUBZone, did not qualify for HUBZone certification. Specifically the website said:

> Although service and construction industry firms may exclude employees that are working at job sites (when determining principal office only) this waiver does not pardon those firms from having to meet the statutory requirement of having a Principal Office in a HUBZone. All HUBZone firms must have a principal office that at least one or more employees perform the greatest amount of their work, regardless of the firm's industry. Therefore, at a minimum, at least one employee must perform the greatest amount of their work at that HUBZone office location.
> . . . .
> **Example 2**
> A firm has an office located in a HUBZone but all employees, including the owner/proprietor, work at jobsite locations fulfilling contractual obligations. In addition, no administrative tasks such as writing proposals, generating payroll, etc. are performed by the owner/proprietor at the office. In this example, the firm would not meet the principal office requirement because the firm does not have any employees performing their work at the HUBZone location.

---

1.     HUBZone companies may also be owned by other entities, such as Tribal Governments. *See* 13 C.F.R. § 126.200. Because Kim Akraut is the owner of Air Ideal, the requirements listed are those for HUBZone companies owned by U.S. citizens.

20. The SBA website contained the language quoted in Paragraph 19 throughout 2010.

### B. Kim Amkraut submits fraudulent HUBZone Application.

21. On or about September 8, 2010, Kim Amkraut submitted an electronic HUBZone Application to the SBA on behalf of Air Ideal.

22. On the HUBZone Application, Kim Amkraut listed Air Ideal's principal office as "37 N ORANGE AVE, STE 500, ORLANDO, FL 32801-2459." The HUBZone Application also listed 324 Grey Owl Run, Chuluota, FL 32766 as a mailing address only.

23. The HUBZone Application listed Kim Amkraut as the person who entered the information into the Application.

24. On or about September 11, 2010, Kim Amkraut, on behalf of Air Ideal, signed a HUBZone Program Certification. Kim Amkraut mailed the Certification to the SBA on or about September 15, 2010.

25. The Certification contained the following statement:

The U.S. Small Business Administration (SBA) relies on the information in the applicant's online submission, this form and any documents or supplemental information submitted in connection with this application to determine whether the applicant qualifies as a HUBZone small business concern (SBC). The definitions for the terms used in this certification and throughout this application are set forth in the Small Business Act (15 U.S.C. § 632), SBA regulations (13 C.F.R. Part 126), and also any statutory and regulatory provision referenced in those authorities.

26. The Certification further stated: "The undersigned has reviewed, verified and certifies that":

    a. "The applicant's principal office is located in a HUBZone."

      b.    "All the statements and information provided in the applicant's online application, this form and any attachments are true, accurate and complete. If assistance was obtained in completing this form and the supporting documentation, I have personally reviewed the information and it is true and accurate. I understand that these statements are made for the purpose of determining eligibility and continuing eligibility in the HUBZone Program. In addition, the applicant will immediately notify the SBA of any material change which could affect the applicant's HUBZone SBC eligibility."

      c.    "The certifications in this document are continuing in nature. Each HUBZone prime contract or subcontract for which the applicant submits an offer/quote or receives an award while a HUBZone SBC constitutes a restatement and reaffirmation of these certifications."

27.    Above the signature line, the Certification contained the following warning:

> Warning: By signing this certification you are representing on your own behalf, and on behalf of the applicant, that the information provided in this certification, the application and any document or supplemental information submitted in connection with this application, is true and correct as of the date set forth opposite your signature. Any intentional or negligent misrepresentation of the information contain in this certification may result in . . . civil . . . sanctions including, but not limited to . . . treble damages and civil penalties under the False Claims Act . . . ."

28.    The HUBZone Application, and in particular, the statement listing the principal office as 37 North Orange Avenue, was false because that address was not where the majority of Air Ideal's employees worked. In fact, no Air Ideal employees ever performed any work at this location.

29.    The 37 North Orange Avenue address is a "virtual office" suite in which Air Ideal paid for certain services (such as the use of the mailing address) from Execu-Suites, the company that operates the virtual office and employed the administrative staff who worked there. Air Ideal did not have any actual office there nor any employees who performed any work there.

30.    Rather, Air Ideal performed office work at the Grey Owl Run address as of September 8, 2010 and through April, 2011. As of September 8, 2010 and through the present,

the Grey Owl Run mailing address listed on the HUBZone Application was not located in a designated HUBZone.

31. On or about September 9, 2010, SBA HUBZone Analyst Christal Friend emailed Kim Amkraut to request additional documentation in support of Air Ideal's HUBZone Application.

32. In response to this request, Amkraut, on behalf of Air Ideal, submitted a document to the SBA via email on September 15, 2010, that listed the North Orange address as Air Ideal's "Principal Address Location," and the Grey Owl Run address as the company's "mailing address." The document was submitted on Air Ideal letterhead that listed its address as the North Orange Avenue address.

33. Kim Amkraut, on behalf of Air Ideal, also submitted, as part of the same email referenced in Paragraph 32, a document titled "Employee List." The Employee List stated that Mitchell Amkraut's and Kim Amkraut's "Primary Work Location" was at the "Principal Office."

34. The "Employee List" also stated, for both Mitchell and Kim Amkraut, that they did not reside in a HUBZone.

35. On or about September 14, 2010, Kim Amkraut, on behalf of Air Ideal, submitted to the SBA a purported "lease agreement" for the North Orange Avenue (HUBZone) location that was a fabrication and forgery. The purported agreement appeared to be a standard commercial lease agreement. However, Execu-Suites never used this agreement.

36. The purported lease agreement appeared to be signed by an Execu-Suites representative who did not in fact sign this document.

37. Kim Amkraut, on behalf of Air Ideal, also submitted a purported liability insurance certificate to the SBA via email on October 5, 2010. The certificate that was submitted

identified the insured premises as the North Orange Avenue (HUBZone) location. This certificate, too, was likewise a fabrication

38. On or about September 29, 2010, Seth Howell, a contractor for the SBA working in the SBA's HUBZone Support Group, emailed Kim Amkraut. In the email, Howell wrote: "Firm listed 324 grey owl run, Chuluota, FL as the company's mailing address. Do any employees work out of this location? If so, please explain."

39. On or about October 1, 2010, Kim Amkraut responded as follows:

Air Ideal Inc was working out of a home office: 324 Grey Owl Run Chuluota, FL 32766 since 7/2005. In February 2010 we decided to lease office space in a centrally located downtown Orlando area in order to allow us to expand our business and hire employees.

We have our mail sent to our home address: 324 Grey Owl Run Chuluota, FL 32766 as a security precaution so all of our important tax, financial and business documents are not lost or stolen as there is not always someone in our main office to accept our mail.

No employees work out of this location. It is strictly a mailing address only.

40. The response contained several false and/or misleading statements.

   a. Both Kim and Mitchell Amkaut continued to perform work for Air Ideal at their home address (on Grey Owl Run) as of and prior to September 29, 2010, and through April, 2011. Accordingly, the statement that implies that Air Ideal moved to the downtown Orlando address in February is false and misleading.

   b. The agreement Air Ideal signed with Execu-Suites was not a lease agreement, but rather a virtual office agreement that did not entitle Air Ideal to occupy office space as a tenant.

   c. The statement that Air Ideal had mail sent to the Amkrauts' home for "security purposes" because an employee was not always present at the main

-10-

office is false and misleading. Execu-Suites staffed the virtual office daily during business hours, and as such there was always someone present to receive mail. The statement is also false as it implies Air Ideal did sometimes have employees working at the HUBZone location, when in fact Air Ideal never had any employees working at that location.

41. As a result of aforementioned misrepresentations and false documents, SBA approved Air Ideal's HUBZone Application on or about November 8, 2010. The approval letter stated, among other things, "It is your responsibility to continually ensure that your firm meets the requirements of the program."

### C. Air Ideal uses its Grey Owl Run (non-HUBZone) address for nearly all company business.

42. Despite having its purported "principal office" in a HUBZone on North Orange Avenue, Air Ideal listed the Amkrauts' home address for nearly all Air Ideal business.

43. Air Ideal used the home address for its tax returns, as well as with other companies with which it did business, including AT&T, Brighthouse Networks, Bank of America, and Gray Insurance Company. Air Ideal also listed the Grey Owl Run address as its "principal address" with the Florida Secretary of State, Division of Corporations.

### D. Air Ideal leases office space in non-HUBZone location.

44. Beginning in April, 2011, and through June, 2013, Air Ideal occupied leased office space at 561 E. Mitchell Hammock Road, Suite 400, Oviedo, Florida 32765.

45. The address listed in Paragraph 44 was never in a designated HUBZone location during the time Air Ideal leased space there.

46. Air Ideal never informed the SBA that it had moved to the location on Hammock Road.

47. Air Ideal decertified from the HUBZone program in July, 2013 following a site visit by the SBA that found no employees working at the HUBZone location.

**E. Air Ideal obtains HUBZone contracts from government agencies using its fraudulently-obtained HUBZone certification.**

48. Using its fraudulently obtained HUBZone certification, Air Ideal submitted bids on and was awarded the following contracts:

    (a) Department of Interior (National Park Service): Contract No. INP11PC00615, awarded July 15, 2011, in Bar Harbor, Maine.

    (b) Department of Homeland Security (Coast Guard), Contract Nos:
        i. HSCG82-11-C-PMVA17, awarded August 5, 2011, in Miami, Florida.
        ii. HSCG82-12-C-PACP05, awarded July 24, 2012, in Miami, Florida.

    (c) Department of Defense (Army), Contract Nos.:
        i. W91151-12-C-0033, awarded June 29, 2012, in Fort Hood, Texas.
        ii. W91151-12-C-0047, awarded August 27, 2012, in Fort Hood, Texas.

    (d) U.S. Army Corps of Engineers, Contract No. W91236-13-C-0034, awarded March 13, 2013, in Norfolk, Virginia.

49. Each of the contracts listed above ("the Contracts") were listed as set-asides for qualified HUBZone small businesses, in that only HUBZone-certified companies were eligible to bid-on and receive the Contracts.

50. Each of the Contracts incorporated Federal Acquisition Regulation clause 52.219-3(b) (48 C.F.R. § 52.219-3(b)), which states, in pertinent part:

> (1) [o]ffers are solicited only from HUBZone small business concerns. Offers received from concerns that are not HUBZone small business concerns shall not be considered.

(2) Any award resulting from this solicitation will be made to a HUBZone small business concern.

51. Defendants submitted or caused to be submitted the bids under the Contracts and the claims for payment under the Contracts.

52. For the USACE contract and Army contract no. W91151-12-C00047, the defendants submitted Air Ideal's HUBZone certification letter as part of its bid package.

53. Air Ideal and Kim Amkraut knew that the HUBZone certifications in the bids on the Contracts, as well as the claims for payment under the resulting Contracts, were false when submitted.

54. Exhibit A lists each Contract, the HUBZone certifications contained in each contract, the invoices submitted under each contract, and the amount of the payments made by each agency for each of the invoices. Each of the invoices listed in Exhibit A is a false claim for payment.

### F. Air Ideal certified its HUBZone status as part of each contract.

55. Air Ideal certified in its Online Representations and Certifications Application (ORCA) that it was a qualified HUBZone business, and then represented as part of its bids on the Contracts that this certification was current and accurate.

56. On May 2, 2011, Air Ideal submitted, or caused to be submitted, the company's ORCA for the time period of May 2, 2011 through May 2, 2012.

57. In the ORCA, Air Ideal states: "It is a HUBZone small business concern listed, on the date of this representation, on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration, and no material change in ownership and

control, *principal office*, or HUBZone employee percentage has occurred since it was certified in accordance with 13 CFR part 126." (emphasis added).

58.     This representation in the ORCA was false, and the defendants knew that it was false when made. Air Ideal only appeared on SBA's list of HUBZone concerns because it obtained that listing through its false statements and documents as part of the HUBZone application process. The certification was false for the additional reason that Air Ideal had moved its principal office (to another non-HUBZone location) in April, 2011 without being recertified and without notifying the SBA.

59.     On or about March 5, 2012, Air Ideal submitted, or caused to be submitted, another ORCA containing the same representation as in the prior year's ORCA concerning Air Ideal's HUBZone status.

60.     This representation in the ORCA was false, and the defendants knew that it was false when made. Air Ideal only appeared on SBA's list of HUBZone concerns because it obtained that listing through its false statements and documents as part of the HUBZone application process. The certification was false for the additional reason that Air Ideal had moved its principal office (to another non-HUBZone location) in April, 2011 without being recertified or notifying the SBA.

61.     As part of the bids defendants submitted, or caused to be submitted, for the Coast Guard, Army, and Interior contracts, Air Ideal specifically (and falsely) represented that "the offeror verifies by submission of the offer that the representations and certifications currently posted electronically [in the ORCA] . . . are current, accurate, complete . . . ."

  **G.** **Defendants submitted forged document to Department of Justice during investigation.**

62. On August 13, 2013, the United States served the defendants with a Civil Investigative Demand, which required them to answer interrogatories and produce documents.

63. The Civil Investigative Demands specifically required defendants to produce, among other items, "all leases and contracts for the rental or purchase of real estate or office space."

64. The defendants submitted or caused to be submitted its response to the United States Department of Justice on or about October 16, 2013.

65. The submission included a purported "shared office space" agreement for the HUBZone office location on North Orange Avenue.

66. This office space agreement was not authentic and was not a document ever used or agreed to by Execu-Suites.

67. Electronic metadata associated with the document shows that the document was first created on September 3, 2013, just a few weeks after defendants were served with the Civil Investigative Demand, but before the defendants transmitted their response to the Department of Justice.

**Count I: False or Fraudulent Claims**
(31 U.S.C. § 3729(a)(1)(A))

68. Paragraphs 1 through 67 are realleged as though fully set forth herein.

69. Air Ideal and Kim Amkraut knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (2010), formerly

§ 3729(a)(1) (1986), specifically, the invoices submitted by the defendants to the Army, USACE, Coast Guard, and Department of Interior.

70.     Because of the defendants' acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count II: False Statements
(31 U.S.C. § 3729(a)(1)(B))

71.     Paragraphs 1 through 67 are realleged as though fully set forth herein.

72.     The defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2010), formerly § 3729(a)(2) (1986), including the HUBZone Application to the SBA, the fraudulently obtained HUBZone certification submitted by the defendants in its bids, the false ORCAs and false certifications of HUBZone compliance in the bids, and/or the false claims and certifications submitted for payment or in connection with its bids on contracts and/or claims for payment.

73.     Because of the defendants' acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count III: Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA)
(12 U.S.C. §§ 1833a(a), (c)(3))

74.     Paragraphs 1 through 67 are realleged as though fully set forth herein.

75.     By reason of the foregoing conduct, the defendants knowingly made false statements and submitted false documents to the SBA for the purpose of influencing its actions,

including obtaining HUBZone certification in 2010, which is a thing of value, in violation of 15 U.S.C. § 645(a).

76. Under 12 U.S.C. § 1833a(c)(3) and 28 C.F.R. § 85.3(a)(6), defendants are liable for civil penalties.

## Count IV: Breach of Contract

77. Paragraphs 1 through 67 are realleged as though fully set forth herein.

78. By reason of the foregoing conduct, the defendants breached the aforementioned contracts with the United States by submitting claims for payment under the contracts when they failed to perform work in accordance with the terms and conditions of the contracts.

79. By reason of the breach of contracts, the United States has sustained damages in an amount to be determined at trial.

## Count V: Unjust Enrichment

80. Paragraphs 1 through 67 are realleged as though fully set forth herein.

81. By reason of the foregoing conduct and their violation of federal law, the defendants were unjustly enriched and are liable to account for and pay such amounts, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

82. WHEREFORE, Plaintiff, the United States, demands judgment against defendants jointly and severally as follows:

A. Under Counts I and II (False Claims Act), for the amount of the United States' damages, trebled as required by law, plus such civil penalties as are required by law, together with all such further relief as may be just and proper;

  B. Under Count III (FIRREA), a civil penalty of the maximum amount provided by law;

  C. Under Count IV (Breach of Contract), for an accounting and the amount of damages sustained by the United States, plus interest and costs, and expenses, and all such further relief as may be just and proper.

  D. Under Count V (Unjust Enrichment), for an accounting and the amount by which defendants were unjustly enriched, plus interest and costs, and expenses, and all such further relief as may be just and proper;

  E. Such other relief as this Court may deem just and proper, together with interest and costs of this action.

**THE UNITED STATES DEMANDS A JURY TRIAL AS TO ALL ISSUES SO TRIABLE**

                          Respectfully submitted,

                          JOYCE R. BRANDA
                          Acting Assistant Attorney General

                          A. LEE BENTLEY, III
                          United States Attorney

Dated: December 1, 2014         s/ Katherine Ho
                          KATHERINE HO
                          USAO No. 070
                          400 W. Washington Street, Suite 3100
                          Orlando, FL 32801
                          Tel. (407) 648-7539
                          Fax (407) 648-7643
                          Email: Katherine.Ho@usdoj.gov


                          s/ Jonathan H. Gold
                          MICHAEL D. GRANSTON
                          RENÉE BROOKER
                          JONATHAN H. GOLD
                          Attorneys, Civil Division
                          Commercial Litigation Branch
                          Post Office Box 261
                          Ben Franklin Station
                          Washington, D.C. 20044
                          Telephone:  (202) 353-7123
                          Email: jonathan.gold@usdoj.gov